IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,
Plaintiff,

vs.

No. 19-CR-0564 WJ

LOWELL BEGAY,
Defendant.

**DEFENDANT LOWELL BEGAY'S MOTION TO SUPPRESS STATEMENTS AND MEMORANDUM IN SUPPORT THEREOF**

COMES NOW, Lowell Begay, by and through his counsel of record, Erlinda O. Johnson, Esq., and hereby respectfully moves this Court for an order suppressing a statement obtained, by the government, from Mr. Begay during a custodial interrogation on September 13, 2018. As grounds, Mr. Begay submits the following memorandum brief.

**INTRODUCTION**

Sometime in the late night of September 11, 2018, in a home in Nenahnezad on the Navajo reservation in San Juan County, New Mexico, Jane Doe was killed by a single gunshot. According to the evidence, various individuals provided to law enforcement agents differing accounts about what had occurred in the home. Some of the witnesses identified Lowell Begay as one of the individuals who had been inside the home's living room at the time Jane Doe suffered the gunshot. Interestingly, none of the witnesses claimed to have directly observed Mr. Begay shoot Jane Doe.

On September 13, 2018, Navajo Nation Criminal Investigator Jefferson Joe and Federal Bureau of Investigation (FBI) Agent Kalon Fancher located Mr. Begay in a home where he had

been staying and transported him to a law enforcement building in Shiprock, New Mexico for an interview about the events that had transpired at the Nenahnezad home on September 11, 2018, and the shooting of Jane Doe. Once at the law enforcement building, Mr. Begay was placed in an interview room with the door closed as the two armed law enforcement officers sat with Mr. Begay at a table. Prior to being taken by agents, Mr. Begay had been smoking marijuana. Moreover, Mr. Begay has a ninth-grade education, struggles to read, has a borderline to low average intellectual ability, has been confirmed by psychological testing to be prone to suggestibility and is highly suggestable when slight interrogative pressure is applied.

Prior to initiating the interrogation, the officers handed Mr. Begay a form with an advice of rights and asked him to read the advice of rights out loud. Mr. Begay read the advice of rights form out loud and at times, struggled to pronounce some words. Once Mr. Begay finished reading the form, Officer Joe told him, "if you agree to talk with us . . . then I would just ask you to sign". At no point, was Mr. Begay asked if he understood what he had just read or if he wished to waive his rights. Instead, the officers instructed Mr. Begay to sign the form and proceeded with the interrogation.

During the lengthy interrogation, Mr. Begay repeatedly denied shooting Jane Doe. Unsatisfied with Mr. Begay's responses, agents continued to press Mr. Begay. Agents told him what they believed happened and suggested to Mr. Begay that he shot Jane Doe accidentally. Agents continued to suggest answers to questions they posed to Mr. Begay. For example:

JJ: They said Mongo gave you a gun.
LB: Uh-uh. He had a gun?
JJ: ***Mongo gave you a gun.***
LB: I don't even have a gun. I know he, that's why I heard that, he has a gun from-from, that morning, that morning ...

(Exhibit A- p. 25)

JJ: No I'm just asking you, did Mongo give you a gun?
LB: No. I don't, I don't ...
JJ: Cause everybody is telling us.
LB: He might have given me a gun. I do not know. I-I-I don't remember going over there, that house, like I said sir. I don't ...

(*Id*. at 27). Unhappy with the answers Mr. Begay was providing, the agents continued to press him to provide the answers they suggested.

JJ: See that's not gonna work for us at least.
LB: Oh darn, man.
JJ: That's not gonna work for us.
LB: Okay.

(*Id*. at 27). Mr. Begay insisted that he did not recall the events of the night of September 11, 2018, as he had blacked out due to intoxication. However, the agents pressed on telling Mr. Begay that his answers were not satisfactory.

JJ: Everybody says that Mongo gave you the gun and you went inside there, the house, with it.

LB: No. No. No. No. I do not remember going over there or seeing any-anybody else except Marcus, Pam and Char. That was in the vehicle and then I thought they dropped me off.

JJ: Who was home when you got home? Uh, understanding that you probably live alone is that true?

LB: Yes in the trailer, yes and then I went next door that morning to, um, tell, uh, uh, if that, if I came over here to the trailer, to the house, my-my lighters and my-my-my keys, you know, is it in here and then my hat and they said no, and I was like so I went back to my trailer, looked over there again, nothing so okay I race back over there to go see if Marcus has, still over there before he takes off to work. And I didn't want to run up there to Vergie's because maybe he went back down here too, you know, so I did not know, I-I don't know I said we partied up there and I jumped in the back and then I still drinking with them, with-with that, the next thing I woke up inside the trailer that morning.

JJ: So we still have a problem. We're-we're-we're not getting anywhere.

(*Id*. at pp. 28-29). When Mr. Begay continued to insist he did not recall, agents ramped up the pressure.

JJ: Well you were there okay?

LB: Okay. You already said I was there.
JJ: You were there.
LB: Okay.

(*Id*. at p. 30) In fact, several times during the interrogation, Mr. Begay advised agents that he did not recall the events of the night of September 11, 2018, but that the information agents were telling Mr. Begay was essentially putting ideas in his head.

KF: Lowell, well it seems like pieces are coming back though to you. Like that's what it seems like to me that-that you are remembering pieces of it. Because ...

LB: No, I don't. Cause what you guys are telling me is what's-what's going through, like jogging through my head like what-what, why-why is this like people telling you this and I'm not the guy that does this kind of thing.

(*Id*. at p. 32) The suggestions and pressure continued throughout the nearly two-hour interrogation with some notable exchanges that clearly show agents suggested a narrative to Mr. Begay which he eventually accepted.

KF: Like it's-it's something, it's one of those things where if-if it was an accident, shit we-we have accidents all the time right?
LB: Yes. Yes. Yes.

(*Id*. at 35)

KF: It's either possible right? Because you don't remember anything, or you don't remember. And it actually happened right?
LB: You know, it's an accident huh?
KF: Was it?
LB: It has to be.
KF: You tell me.
LB: I do not know sir, I-I it sounded like more witnesses there, you know, that would….

(*Id*. at 37)

KF: But it's not news to you. Because here's the thing, you were told by somebody else already that you did this.

(*Id*.)

KF: ... the thing is Lowell if you keep this up ...
LB: Uh-uh.

KF: ... this mentality of that this is all new to me right because it's not. You know exactly what people are saying you did. You know that. And we know that. The thing is ...
LB: It was an accident.
KF: Okay. Was it?
LB: Yes, it was an accident.

(*Id*. at 38)

KF: So, okay. So, okay I think you're starting to get there right.
LB: Yeah.
KF: But what, so let's-let's back up okay. So, Mongo gave you a gun, right?
LB: Just to see, to examine it yes.

(*Id*. at 39)

KF: Lowell come on man.
LB: I do not know, really. I don't.
KF: Lowell we're getting, Lowell we're getting ...
LB: You guys are probably gonna, give me a polygraph test. Give me a polygraph test.
KF: We're giving you every opportunity man.
LB: I know. I know you guys are, I-I really do not know.
KF: And-and here's the thing, here's the thing, cause I'm and-and I'll give you one more opportunity right, okay.

(*Id*. at 42)

LB: Okay well then it was probably one of those two **or like you said it was probably an accident** and they were trying to blame who was inside there, they're like ...

(*Id*. at 52) After a while insisting that he did not have a gun, agents suggested to Mr. Begay that he was indeed holding a gun.[1]

KF: You were holding it, Lowell.
LB: Yeah, but they were trying to get it.
KF: Okay.

[1] Mr. Begay's purported admission that he was holding a gun on the night of September 11, 2018, is also suspect because when asked to describe the gun, he was not able to do so. (Exhibit A, pp.45-46)

(*Id*. at 54). Agents engaged Mr. Begay in a protracted exchange. After some time had elapsed and agents had engaged in psychological pressure and suggestive interrogation of Mr. Begay, he admitted to the shooting.

## ARGUMENT

### LOWELL BEGAY'S STATEMENTS WERE OBTAINED IN VIOLATION OF *MIRANDA v. ARIZONA* AND THEREFORE MUST BE SUPPRESSED

#### *A. Mr. Begay was in Custody for Purposes of Miranda v. Arizona*

The Fifth Amendment to the United States Constitution protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. *Miranda v. Arizona,* 384 U.S. 436, 478–79 (1966); *see also United States v. Salvo,* 133 F.3d 943, 948 (6th Cir.1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." *Stansbury v. California,* 511 U.S. 318, 322 (1994); *Salvo,* 133 F.3d at 948.

A custodial interrogation occurs when questioning is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *See Berkemer v. McCarty*, 468 U.S. 420, 428 (1984)(quoting *Miranda,* 384 U.S. at 444). *Id.* Determining whether a suspect is in custody for *Miranda* purposes depends upon "whether a reasonable person in [the suspect's] position would have understood [his] freedom of action to have been restricted to a degree consistent with formal arrest." *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir.2007). "Custodial interrogation" means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S., at 444.

There are "'[t]wo discrete inquiries . . . essential to the determination'" of custody: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)(quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

The determination of custody is based on the totality of the circumstances, and can include the following non-exhaustive factors:

> 1. The extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will[;] ... 2. The nature of questioning, where prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave[;] ... and, 3. Whether police dominate the encounter.

*United States v. Jones,* 523 F.3d 1235, 1240 (10th Cir.2008). Additionally, there are many subfactors courts may consider in order to determine whether police dominate the encounter:

> Separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id*. In *United States v. Fred*, 322 Fed.Appx. 602, 607 (10th Cir. 2009), a case with similar facts to those present here, the Tenth Circuit held that the defendant was in custody for purposes of *Miranda.* In that case, the defendant showed up at the FBI office in Gallup, New Mexico, for an interview with agents about allegations of sexual abuse of a minor, N.F. *Id.* at 603. Once at the FBI office, the defendant was escorted to a conference room where he was questioned by two armed agents sitting at a table with the defendant while the door to the room was slightly ajar. *Id*. at 606-07. Given those facts, the Tenth Circuit reversed the district court's finding that Mr. Fred was not in custody for purposes of *Miranda*. *Id*. at 607.

Unlike the defendant in *Fred*, Mr. Begay's custodial status began before he arrived at the law enforcement building. Indeed, agents found him in a home where he had been staying and transported him from the home to the law enforcement building in Shiprock, New Mexico. Once in the building, agents escorted Mr. Begay to a closed interview room, where the noticeably armed agents sat around a table with Mr. Begay, in the enclosed room, while they interrogated him. Mr. Begay was never told he was free to leave and end the interrogation. Given the surroundings in which the interrogation took place and the manner in which Mr. Begay arrived at the law enforcement office, a reasonable person in Mr. Begay's position would have believed he was not free to leave. Therefore, he was in custody for *Miranda* purposes.

***B. The Advise of Rights Given to Mr. Begay was Invalid, Therefore his Statements Must be Suppressed***

The *Miranda* Court was adamantly concerned with the use of psychological ploys inducing the subject to submit to questioning during an interrogation. Consequently, the Court held:

> At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. ... More important, such a warning is an absolute prerequisite in overcoming the inherent pressure of the interrogation atmosphere.

*Id*. at 467-68 (emphasis added). The Court further held that "warning to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court." *Id*. at 469. The Court added the "individual must be clearly informed that he has a right to consult with a lawyer and to have the lawyer with him during interrogation ..." *Id*. at 471. Further, that "if he is indigent a lawyer will be appointed to represent him." *Id*. at 473.

In *Miranda*, the Supreme Court noted "that the modern practice of in-custody interrogation is psychology rather than physically oriented." *Id*. at 448. The Court's analysis

focuses on the various interrogation techniques used to coerce a statement, noting "coercion can be mental as well as physical." *Id*. Citing to various texts, the Court noted that interrogation manuals tell officers "the 'principal psychological factor constituting to a successful interrogation is privacy - being alone with the person under interrogation.'" *Id*. (*citing, Inbau & Reid, Criminal Interrogation and Confession*, p.1 (1962)). Of concern to the Court were the tactics used by law enforcement urged by interrogation manuals. The court found that the techniques "of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Id*. at 455.

A waiver of *Miranda* rights can only be made knowingly and intelligently when made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Morris*, 287 F.3d 985, 988 (10th Cir.2002). "The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez v. Moran*, 509 U.S. 389, 401 (1993). When a defendant waives his constitutional rights, he must be "made aware of the dangers and disadvantages . . . so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta v. California*, 422 U.S. 806, 835 (1975)(*quoting Adams v. U.S. ex.rel. McCann*, 317 U.S. 269, 279 (1942)).

In *Moran v. Burbine*, 475 U.S. 412 (1986), the Supreme Court explained that a court must make two distinct findings in order to conclude that a defendant's statement was made after a knowing and voluntarily waiver of the *Miranda* rights. First, the decision to relinquish the rights and make a statement must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. at 421. Second, the waiver

must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* In sum, the *Miranda* waiver must be both voluntary and knowing.

When the prosecution seeks to admit a defendant's inculpatory statement at trial the prosecution must prove by a preponderance of the evidence that in making the statement, the defendant knowingly and voluntarily waived his *Miranda* rights. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421. This requires the prosecution to show that the *Miranda* warning was given to the defendant, that the defendant understood his *Miranda* rights, and that the defendant then made an uncoerced statement. *Berghuis v. Thompkins,* 560 U.S. 370, 383 (2010).

Here, at the beginning of the interrogation in the enclosed interview room, agents handed Mr. Begay an advice of rights form. The agents asked Mr. Begay to read the form out loud. Mr. Begay proceeded to read the following:

LB: Okay. Before you are asked any questions you must understand your Rights. You have the right to remain silent and anything you say can be used against you in Court. You have the right to talk to an-a lawyer for advice before you are asked any-any questions. You have the right to have a lawyer with you during questioning. If you cannot afford a lawyer, one we'll appoint for you before-before any questioning if you wish. If you care to answer questions now, uh, without a lawyer present you have the right to stop answering any questions. Okay. I have read this Statement of my Rights and I understand what my Rights are. At this time, I am willing to, wait, I am willing to answer any questions with a lawyer present, that it.

JJ: Uh, without a lawyer present?

LB: Oh, without a lawyer present.[2]

[2] It should be noted that the audio recording of Mr. Begay reading the form out loud demonstrates he struggled to read some of the words and did not comprehend what he had read as he clearly misread the last sentence and had to be corrected by one of the agents.

(exhibit A at 4) After appearing to struggle somewhat with the reading of the advice of rights, one of the agents told Mr. Begay,

> Okay so you if you agree to talk with us, you know, then I would just ask you to sign down right here. Just put the time down there. Today's the 13th.

(Exhibit A, p. 4) At not time did the agents ask Mr. Begay if he understood his rights and the nature of those rights. Indeed, there is nothing on the recording which indicates Mr. Begay understood the rights through which he struggled to read. In fact, Mr. Begay was not even asked if he agreed to waive those rights. The agent simply told him, "okay, so … if you agree to talk with us, you know….sign down right there." That hardly qualifies as a proper inquiry into whether Mr. Begay understood his rights and whether he was willing to waive his rights. Mr. Begay's purported waiver was neither knowing nor intelligent. Mr. Begay was clearly confused and high on marijuana during the interview as he had told agents he had been smoking marijuana prior to the interview. Indeed, the fact that he was under the influence of drugs is a factor this Court must also consider in determining the validity of a waiver. *See United States v. Betters*, 229 F.Supp.2d 1103, 1109 (D.Or. 2002).

C. ***Mr. Begay's Statements were Involuntary***

Even when the *Miranda* warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those *Miranda* rights before it may introduce a confession by a defendant. *Colorado v. Connelly,* 479 U.S. 157, 169-70 (1986). Notably, when a custodial police interrogation is conducted without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant voluntarily, knowingly and intelligently waived his privilege against self-

incrimination and his right to retained or appointed counsel. *Miranda v. Arizona*, 384 U.S. 436, 475 (1966).

In determining the voluntariness of a confession based on the totality of the circumstances, court examines (1) defendant's age, intelligence and education, (2) length of the detention and interrogation, (3) length and nature of the questioning, (4) whether defendant was advised of his constitutional rights, and (5) whether defendant was subjected to or threatened with any physical punishment. *United States v. Williams*, 576 F.3d 1149 (10th Cir. 2009).

An incriminating statement is voluntary only if it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. *United States v. Vialpando*, 588 F.3d 1124 (7th Cir. 2009). A confession that was not the product of free will and rational intellect or that was made when the individual's will was overborne by physical, psychological, or drug-induced means is inadmissible. *Parker v. Allen*, 565 F.3d 1258 (11th Cir. 2009); *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)(A confession is involuntary when it was given in circumstances that were sufficient to overbear the confessor's free will).

If there was police coercion or overreaching which overbore the accused's will, the resulting confession is considered involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 165-66 (1986). Confessions which are involuntary, i.e., the product of coercion either physical or psychological offend the Due Process Clause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-226 (1973); *Connelly*, 479 U.S. at 165-66. This is so:

> …not because such confessions are not true but because the methods used to extract them offend an underlying principal in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system- a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against the accused.

*Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961). In determining whether a confession was involuntary, the ultimate issue is whether the defendant's will was overborne by the inducements or other pressures applied, so that the resulting confession was the result of coercion, rather than the result of his own free will. *Ferguson v. Boyd*, 566 F.2d 873 (4th Cir.1977). The Court must determine whether the circumstances surrounding the defendant's confession would have interfered with his free and deliberate choice of whether to confess. *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992).

The inquiry is not whether the conduct of law enforcement officers in obtaining a confession was shocking but whether the confession was free and voluntary, that is, it must not be extracted by any sort of threats or violence, . . . however slight, nor by the exertion of any improper influence. *Malloy v. Hogan*, 378 U.S. 1, 7 (1964). "[A] defendant's statement that is extracted or induced by threats or promises is involuntary." *United States v. Hernandez,* 93 F.3d 1493, 1503 (10th Cir.1996) (citing *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202 (1976)).

If the Court were to find the advice of rights here was proper, Mr. Begay's statements must still be suppressed because they were not freely and voluntarily obtained. Instead, they were the product of persistent psychological pressures. Agents continually suggested a narrative to Mr. Begay and told him his statements were not satisfactory. Throughout the interrogation agents pressured a low intellectually functioning Mr. Begay to admit he shot Jane Doe by suggesting answers to questions, by raising their voices and tone and by telling Mr. Begay his answers simply were not going to "work for" them.

"[W]here conditions of interrogation are so coercive that they rob suspects of their free will, courts will suppress defendants' statements notwithstanding the fact that these statements came on the heels of properly administered *Miranda* warnings." *United States v. Alvarez*, 142

F.3d 1243, 1248 (10th Cir. 1998)(*citing, United States v. Anderson*, 929 F.2d 96 (2nd Cir. 1991)(defendant told that if he asked for an attorney he would not be able to cooperate); *see also, Hart v. Attorney Gen. of the State of Fla*., 323 F.3d 884, 894–95 (11th Cir.2003) (detective contradicted *Miranda* warnings by telling suspect that having a lawyer present would be a "disadvantage" and that "honesty wouldn't hurt him"); *United States v. Beale*, 921F.2d 1412, 1435 (11th Cir.1991)(agents told illiterate defendant that signing waiver form "would not hurt him"); *United States v. Lall*, 607 F.3d 1277 (11th Cir. 2010)(detective promised the defendant he would not be charged prior to being questioned)).

After repeatedly telling the agents that he did not remember the events of the night of September 11, 2018, and nearly an hour into the interrogation, agents ramped up the pressure on Mr. Begay by suggesting a narrative to him. Mr. Begay's will was overborne when agents repeatedly pressed him to admit he shot Jane Doe. This is of particular concern because Mr. Begay is highly suggestible when slight interrogative pressure is applied.

In addition to having the burden of establishing that Mr. Begay's incriminating statements were voluntary, the government has a heavy burden to demonstrate that statements elicited during custodial interrogation without counsel were the result of the defendant's knowing and intelligent waiver of his privilege against self-incrimination and his right to retained or appointed counsel. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). A valid waiver will not be presumed simply from the fact that a confession was obtained. 384 U.S. at 475.

In the absence that Mr. Begay voluntarily, knowingly and intelligently waived his constitutional rights to counsel and against self-incrimination, the Court may not presume a waiver and his statements must be suppressed. The statements given by Mr. Begay to agents on September 13, 2018, were not given voluntarily. He did not knowingly, voluntarily and

intelligently waive his *Miranda* rights.

**D. *Mr. Begay's Confession was the Product of Psychological Coercion***

Coercion is largely considered from the perspective of the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "[C]oercion can be mental as well as physical, and ... the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279 (1960); *Rogers v. Richmond,* 365 U.S. 534, 540 (1961). "Coercion may involve psychological threats as well as physical threats." *United States v. Finch,* 998 F.2d 349, 356 (6th Cir.1993).

"Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment...." *Griffin v. Strong,* 983 F.2d 1540, 1543 (10th Cir.1993) (quoting*United States v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied,* 503 U.S. 989 (1992)). Coercion may include situations where a government agent overreaches by exploiting the defendant's known weakness. *United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir. 1996).

In psychological coercion cases, a Court must consider the totality of the circumstances involved and their effect upon the will of the defendant. *Schneckloth*, 412 U.S. at 226-27. Thus, in assessing a claim of psychological coercion, courts have considered the defendant's unique characteristics, the duration of the interrogation and the defendant's conditions of confinement. *United States v. Karake*, 443 F.Supp.2d 8, 51 (D.C. Cir. 2006), *citing Brooks v. Florida*, 389 U.S. 413, 414-15 (1967) (finding an element of psychological coercion when the defendant confessed after he was confined in solitary confinement for fourteen days under the sole control and domination of his jailers).

In the instant case, there was both coercion and interrogation. The Supreme Court has defined "interrogation" as not only express questioning, but also any words that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Mr. Begay had been smoking marijuana prior to being transported to the station. He is a high school dropout and is unsophisticated. Agents psychologically manipulated him and preyed on his fears. After a lengthy, relentless and highly suggestive interrogation period, Mr. Begay confessed and affirmed what agents had been suggesting to him. The alleged confession was not obtained until agents exploited Mr. Begay's vulnerable emotional and mental state.

Mr. Begay's confession was coerced and thus involuntary for several reasons. First, agents preyed upon Mr. Begay's vulnerabilities, low functioning intellect, susceptibility to suggestion and emotional state. When he kept insisting that he could not recall the events of the night of September 11, 2018, because he had blacked out, agents began to suggest to him what they believed happened. Mr. Begay became noticeably confused and began to agree with the agents' narrative. Agents also misrepresented the evidence by telling him that gun powder residue test results showed no one else present in the home that night had handled a firearm and that everyone was saying he had shot Jane Doe. All these factors constituted sufficient improper pressure that caused a coerced and involuntary confession.

When *Miranda* warnings are given, they are vitiated by context of combining warning of right to remain silent with use of intimidation and promises to induce breaking of silence. *United States v. Pinto*, 671 F. Supp. 41 (D. Me. 1987). In *Pinto, supra*, the defendant's confession was not voluntary where the defendant was a young man of average intelligence, who did not complete high school, and who had never before been arrested, detained, or questioned

by police. His initial questioning was conducted by the arresting officer in a parked police car with another marked police car positioned near passenger side of car and uniformed policeman were standing directly outside the door on passenger side of police car. The officer was much larger and more experienced in such matters than defendant. The officer stated and reiterated during questioning that he was the only person standing between defendant and long jail term, intimating that, if defendant should cooperate, the officer would protect him from going to jail. *Id.* at 45-47. All the foregoing factors set the stage for an involuntary confession, requiring suppression of the statement.

Like the defendant in *Pinto,* Mr. Begay's lack of sophistication, low functioning intellect and physical state of being under the influence of marijuana were exploited. Agents coerced Mr. Begay into confessing. By the repeated psychological manipulation by the agents, Mr. Begay's will was overborne. His resulting incriminating statements were involuntary and must be suppressed.

Mr. Begay respectfully requests an evidentiary hearing in order to establish the factual allegations of this motion challenging the voluntariness of defendant's statement, and the denial of his right to Due Process. *See Jackson v. Denno*, 378 U.S. 368 (1964).

**Conclusion**

Wherefore, for the foregoing reasons, defendant Lowell Begay urges this Court to suppress his statements obtained by the government on September 13, 2018.

Respectfully Submitted,

electronically filed 2/26/2021
Erlinda O. Johnson
Attorney for Lowell Begay
620 Roma Ave. N.W.
Albuquerque, N.M. 87102
(505) 792-4048

I hereby certify that a true and correct
Copy of the foregoing was provided
To counsel for the government, via CM/ECF
This 26th day of February 2021

_________/s/______________
Erlinda O. Johnson
Attorney at Law